UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Respondent, | ) |
| | ) |
| v. | ) Case No. 2:16-cr-20002-SLD |
| | ) |
| KEVIN PETTIS, | ) |
| | ) |
| Defendant-Petitioner. | ) |

ORDER

Before the Court are Defendant-Petitioner Kevin Pettis's *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Pro Se 2255 Motion"), ECF No. 76; counseled Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 ("Counseled 2255 Motion"), ECF No. 79; *pro se* motion for status, ECF No. 97; and counseled motion for a status conference, ECF No. 98.  For the reasons that follow, the Counseled 2255 Motion is DENIED, and the remaining motions are MOOT.

BACKGROUND

I.   Pretrial

On November 24, 2015, a criminal complaint was filed alleging that Pettis, a felon, unlawfully possessed a firearm in violation of 18 U.S.C. § 922(g) on July 7, 2013.  Compl. 1, ECF No. 1.  Assistant Federal Public Defender Elisabeth Pollock was appointed to represent Pettis.  Dec. 4, 2015 Min. Entry.  On January 6, 2016, a grand jury returned an indictment charging Pettis with unlawful possession of a firearm under 18 U.S.C. § 922(g)(1).  *See* Indictment 1, ECF No. 11.  He pleaded not guilty.  Jan. 15, 2016 Min. Entry.

Pettis filed a motion to suppress a firearm and other evidence seized from an apartment pursuant to a search warrant.  *See* Mot. Suppress 1, 3–4, ECF No. 16.  He argued that while the

affidavit in support of the search warrant established probable cause that Pettis fired a weapon (based on eyewitness statements), it "was insufficient on its face to show probable cause to search" the apartment because there was no evidence tying him to the apartment. *Id.* at 7–8. Alternatively, he requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because of alleged material misrepresentations and omissions in the search warrant affidavit. *See* Mot. Suppress 9–10. These included misrepresenting the license plate number of a vehicle Pettis was driving, falsely stating that Pettis lived in the apartment, omitting that the primary witness was intoxicated, and falsely stating the location Pettis was apprehended on July 7, 2013. *See id.* at 4–5.

Via written order, U.S. District Judge Colin Bruce, who was then presiding over the case, denied Pettis's motion to suppress. *See generally* June 29, 2016 Order, ECF No. 38. Judge Bruce concluded that Pettis had no legitimate expectation of privacy in the apartment because he did not live there, "did not mention spending any time" there, and "stated that many people had access to the apartment and the firearm he [was] seeking to suppress was not his weapon and did not belong to him." *Id.* at 13–14. Judge Bruce concluded in the alternative that there was probable cause to search the apartment and the vehicle Pettis was driving and that "none of the alleged discrepancies" in the affidavit "were significant enough to negate a finding of probable cause." *Id.* at 17–18.

## II. Trial

Pettis proceeded to trial. *See* July 6, 2016 Min. Entry. The Government presented evidence that a woman named Shaleke Russell had called the police at around 3:18 AM on July 7, 2013 to report that Pettis fired a gun out of a vehicle at the Oakwood Trace Apartments in Champaign, Illinois. *See* Trial Tr. Vol. I 57:22–62:23, 81:5–83:15, ECF No. 65. She explained

to a police officer who responded to the scene that "she saw [Pettis] seated in a tan Tahoe" in the parking lot of the apartment complex, that "[s]he made contact with [Pettis]," that "they had an argument," and that "[s]he asked [Pettis] to leave." *Id.* at 63:17–24, 64:8–11. She told the officer that Pettis then "cursed at her" and "told her he was not going to leave." *Id.* at 63:24–25. When she told Pettis she was going to call the police, he "began to drive and fired a handgun out the driver's window of the vehicle." *Id.* at 64:2–5. She reported to the officer that Pettis was "the only person that she saw in the vehicle." *Id.* at 64:8–9. Another officer found a shell casing in the parking lot of the Oakwood Trace Apartments. *Id.* at 89:15–22.

Officers went to Pettis's last known address at an apartment complex at 407 South State Street in Champaign to look for him and the tan Tahoe. *See id.* at 66:15–21, 105:11–24. An officer found a tan Chevy Tahoe in the parking lot of the complex which had a license plate similar to the partial plate provided by Russell in her initial report to police. *Id.* at 110:4–112:1. Another officer found Pettis walking up a sidewalk while talking on his cellphone near the complex and arrested him. *See* Trial Tr. Vol. II 45:20–46:1, 46:21–47:2, 48:22–50:24, ECF No. 66. Pettis was transported to the police department and a gunshot residue test was administered on his hands. *See id.* at 71:8–12.

Meanwhile, officers went to apartment one at 407 South State Street, which was Pettis's last known address. *See id.* at 87:11–18. It was evident there had been fire damage to apartment one and it appeared to be vacant. *See id.* at 87:20–25. Police contacted the complex owner who told them that Pettis had moved into apartment five because of the damage to apartment one. *See id.* at 89:7–16. Officers obtained and executed a search warrant for apartment five, *see id.* at 90:1–6, and found body armor, *id.* at 115:8–23, Pettis's Illinois identification card, *id.* at 117:15–19, and letters addressed to Pettis, *e.g., id.* at 117:23–118:6. They also found a firearm, *id.* at

3

89:17–91:6, inside a coat, *id.* at 114:24–25. Over Pettis's objection, *see id.* at 220:24–221:5, the Government introduced two pictures of Pettis in a coat that matched the coat found in the apartment, *id.* at 226:6–228:9.

The Government put on two expert witnesses: a forensic scientist who testified about the gunshot residue test administered on Pettis, *id.* at 132:3–152:2; and a forensic scientist who testified regarding DNA found on the gun, *id.* at 174:22–217:6. The first forensic scientist testified that she concluded based on the results of the gunshot residue test that Pettis "either discharged a firearm with his right hand, or was in the vicinity of a discharged firearm, or came in contact with a primer gunshot residue-related item in regards to his right hand." *Id.* at 147:2–9. She admitted on cross-examination that her "scientific conclusion ha[d] nothing to do with how . . . gunshot residue got on his hand." *Id.* at 150:3–5. The next forensic scientist testified that she concluded that DNA recovered from the gun was consistent with the profile of DNA collected from Pettis. *See id.* at 190:17–198:2. She acknowledged on cross-examination that she did not know what kind of DNA the DNA recovered from the gun was (*i.e.*, DNA from saliva, sweat, or skin, or something else), *id.* at 205:8–11, and that she could not conclude how Pettis's DNA arrived on the gun, *id.* at 211:16–21.

Pettis put on three witnesses. First, his friend Tiesha Lee testified that Pettis was not staying in apartment five at the time of the alleged crime. *See* Trial Tr. Vol. III 9:15–10:4, ECF No. 67. She testified that there was "stuff everywhere" in apartment five and "[i]t kind of looked like some kind of storage area." *Id.* at 12:16–19. She testified that he only kept some of his clothes in apartment five. *Id.* at 12:24–13:3. Second, Gregory Brumfield, who was dating Russell at the time of the alleged crime, *id.* at 35:20–23, testified that Russell was intoxicated the night of the incident, *id.* at 38:18–19. Finally, Pettis's son, Daytreon Pettis, testified that he was

with Pettis on the night of the incident at a party at Russell's house. *Id.* at 50:9–51:8. He testified that three other people—Little Vince, Peewee, and M.J.—were with them. *Id.* at 51:9–12. He testified that Brumfield and Pettis got into an altercation and they were asked to leave. *Id.* at 53:5–13. He, Little Vince, Peewee, M.J., and Pettis got into a tan Tahoe and "M.J. sho[t] a gun out the back window." *See id.* at 54:3–54:19. He admitted on cross-examination that he did not know M.J.'s real name and had not attempted to find it out, *id.* at 59:20–25, that he had not contacted law enforcement to report that someone else had fired the gun, *id.* at 63:21–64:10, and that he did not tell an investigator working for his father's defense that M.J. was the shooter, *id.* at 64:15–65:11.

The parties stipulated that Pettis had previously been convicted of a crime punishable by more than one year of imprisonment (a felony) and that the firearm found in apartment five was manufactured outside of Illinois. Stipulations of Fact ¶¶ 1–2, ECF No. 41.

After hearing the jury instructions and closing arguments from both sides, *id.* at 122:11–206:25, the jury found Pettis guilty of unlawful possession of a firearm by a felon, *id.* at 209:24–210:3; Jury Verdict 1, ECF No. 45.

### III.   Sentencing

The United States Probation Office ("USPO") prepared a presentence investigation report ("PSR") in preparation for Pettis's sentencing hearing. *See* PSR, ECF No. 52. USPO listed his total offense level as 28, *id.* ¶ 32, based on a base offense level of 20, *id.* ¶ 23, and enhancements for the firearm being stolen, *id.* ¶ 24, using the firearm in connection with another felony offense (reckless discharge of a firearm), *id.* ¶ 25, and obstruction of justice (based on Pettis asking Lee to testify falsely), *id.* ¶¶ 20, 28. USPO listed Pettis's criminal history category as VI. *Id.* ¶ 51. As such, it listed his Sentencing Guidelines range for imprisonment as 120 months; it would

have been 140 to 175 months but was capped at the statutory maximum for his charge. *Id.* ¶ 104.[1]

As relevant here, Judge Bruce adopted the PSR and its findings at the November 7, 2016 sentencing hearing. *See* Sentencing Hr'g Tr. 16:20–25, ECF No. 69. The Government requested a sentence of 120 months of imprisonment to be followed by three years of supervised release. *Id.* at 18:10–14. Pettis's counsel did not "quibble with the [G]overnment's proposed sentence," noting that it was "below the guidelines range as calculated properly by [USPO]." *Id.* at 35:15–18. Judge Bruce imposed a sentence of 120 months of imprisonment followed by a three-year term of supervised release. *Id.* at 46:6–25.

IV.   **Appeal**

Pettis appealed. Not. Appeal, ECF No. 59. He argued only that Judge Bruce erred in denying his motion to suppress. *See United States v. Pettis*, 720 F. App'x 306, 308 (7th Cir. 2017). The Seventh Circuit affirmed the denial on December 27, 2017. *Id.* at 307, 310. It assumed without deciding that Pettis had a reasonable expectation of privacy in the apartment the gun was found in (apartment five) but concluded that the warrant to search that apartment was issued upon a showing of probable cause and that even if probable cause were lacking, the officers executing the warrant relied on it in good faith. *See id.* at 308.

---

[1] Both the Government and Pettis filed objections to the PSR. PSR 27–34. Pettis withdrew all but two of his objections at the sentencing hearing. Sentencing Hr'g Tr. 4:14–5:22, ECF No. 69. The remaining objections did not affect the Guidelines range. Instead, one objection related to Pettis's arrest date (which would affect how much time he had already served), *see id.* at 4:14–17, and one objection related to supervised release conditions, *id.* at 5:8–20. The Government's objection related to the enhancement for obstruction of justice. *See* PSR 27. It argued that Pettis committed more obstructive conduct than the PSR listed. *Id.* But at the hearing, the Government asked Judge Bruce to find that no ruling on the objection was necessary since it would not affect the Guidelines range. Sentencing Hr'g Tr. 6:22–7:12.

### V.     2255 Motion

In 2020, Pettis filed the Pro Se 2255 Motion, in which he asserted two claims: 1) that Judge Bruce violated 28 U.S.C. § 455 and the due process clause by presiding over his case, as evidenced by *ex parte* communications Judge Bruce had with the USAO,[2] Pro Se 2255 Mot. 4;[3] and 2) that Federal Public Defender Thomas Patton provided ineffective assistance of counsel by misleading him regarding a tolling agreement, *id.* at 5–6.  Judge Bruce recused himself from hearing Pettis's § 2255 motion and the case was reassigned to this Court.  *See* Mar. 11, 2020 Text Order of Recusal.  The Court appointed counsel to represent Pettis.  Mar. 27, 2020 Text Order.

Counsel filed the Counseled 2255 Motion on October 5, 2020, mooting the Pro Se 2255 Motion.  *See* Counseled 2255 Mot. 1.[4]  In this motion, Pettis asserts three claims: 1) that Judge Bruce violated Pettis's due process rights because he was actually biased against Pettis, *id.* at 14–15; 2) that Judge Bruce violated 28 U.S.C. § 455(a) by failing to recuse himself based on an appearance of bias, *id.* at 15; and 3) that the Federal Public Defender's Office ("FPD") provided ineffective assistance of counsel by failing to include a claim in Pettis's direct appeal based on Judge Bruce's communications with the USAO and by failing to secure tolling agreements to allow Pettis to bring his claims in a motion under § 2255, *id.* at 26–27.

The Government argues that the § 455(a) claim is untimely[5] and not cognizable on a motion under § 2255, that Pettis cannot show that Judge Bruce was actually biased against him,

---

[2] *See United States v. Atwood*, 941 F.3d 883, 884–85 (7th Cir. 2019) (providing a brief explanation of the discovery and disclosure of these communications).
[3] The Court uses the page numbers generated by CM/ECF because the motion is not consistently paginated.
[4] Though counsel states that the Counseled 2255 Motion is "intended to supplement . . . [the] *pro se* pleading," Counseled 2255 Mot. 1, it reasserts all the claims from the Pro Se 2255 Motion.  Accordingly, the Court finds the Pro Se 2255 Motion moot.
[5] The Government does not contest the timeliness of the due process claim because it is covered by a tolling agreement.  *See* Resp. 7 n.3, ECF No. 83.  The Government does not address the timeliness of the ineffective assistance of counsel claim, so the Court does not either.

7

and that Pettis cannot show ineffective assistance of counsel. Resp. 1, ECF No. 83. No reply was filed, but Pettis filed *pro se* and counseled motions regarding the status of the § 2255 motions.

## DISCUSSION

### I. Legal Standard

A prisoner in federal custody may move the court that imposed his sentence to vacate, set aside, or correct it. 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Accordingly, such relief "is available only when the 'sentence was imposed in violation of the Constitution or laws of the United States,' the court lacked jurisdiction, the sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral attack." *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (quoting 28 U.S.C. § 2255(a)).

### II. Analysis

#### A. Due Process

Pettis's due process claim is based on *ex parte* communications between Judge Bruce and the USAO that became public in August 2018, approximately eight months after his appeal was decided. These communications have been detailed and summarized elsewhere. *See Shannon v. United States*, 39 F.4th 868, 876, 883 (7th Cir. 2022) (citing In re Complaints Against District Judge Colin S. Bruce, Nos. 07-18-90053 & 07-18-90067 (7th Cir. Jud. Council May 14, 2019), http://www.ca7.uscourts.gov/judicial-conduct/judicial-conduct_2018/07_18-90053_and_07-18-

90067.pdf). Pettis argues that these communications demonstrate that Judge Bruce was actually biased against him, resulting in violation of his due process rights. Counseled 2255 Mot. 14–17.

"Due process requires 'a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.'" *Shannon*, 39 F.4th at 883 (quoting *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997)). A due process claim can be proved by evidence of the judge's actual bias or by showing that "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* (quoting *Rippo v. Baker*, 580 U.S. 285, 287 (2017)).

The Seventh Circuit has decided a few cases involving due process bias claims based on Judge Bruce's *ex parte* communications which are instructive here. In *United States v. Williams*, 949 F.3d 1056, 1061–63 (7th Cir. 2020), the court held that Judge Bruce presiding over a defendant's trial did not violate the defendant's due process rights where the defendant relied primarily on the *ex parte* communications but the communications did not concern the defendant's case. It noted that the Special Committee appointed by the Judicial Council of the Seventh Circuit to review complaints against Judge Bruce related to the communications "found no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party." *Id.* at 1061–62 (quotation marks omitted). Moreover, the court noted that though the communications exposed a preexisting relationship with members of the USAO, such a relationship "alone does not create a due process violation." *Id.* at 1062. It found that the defendant had "presented no evidence to rebut th[e] presumption" that "judges rise above . . . potential biasing influences." *Id.* (quotation marks omitted). Pettis relies on the same communications that were relied on in *Williams* and considered by the Special Committee, and he points to no emails that concern his case

9

specifically or any evidence showing that the communications impacted his case. *See* Counseled 2255 Mot. 16–17.

In *Shannon*, the Seventh Circuit found that Judge Bruce's participation in a defendant's sentencing hearing, as opposed to only his trial, may warrant a different result under the due process clause because judges have considerable discretion at sentencing. *Shannon*, 39 F.4th at 884–86. In that case, Judge Bruce made comments at sentencing that the court concluded could have been interpreted as a warning that if the defendant appealed, he would impose a harsher sentence. *Id.* at 886–87. Though it ultimately declined to rule on whether there was a due process violation, the Seventh Circuit appeared to be troubled by the combination of the *ex parte* communications and the comments. *See id.* at 884 (declining to resolve the constitutional issue and instead remanding for resentencing under the court's supervisory authority). Pettis points to no similar comment at sentencing that would lend itself to a finding that Judge Bruce was biased against him. Instead, he is relying on the *ex parte* communications alone. *See, e.g.*, Counseled 2255 Mot. 16–17. The Court thus finds that Pettis has failed to show either actual bias or a risk of bias so high that it violates due process. The due process claim is denied.

**B. Section 455(a)**

Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Pettis argues in the alternative to his due process claim that Judge Bruce's *ex parte* communications show an appearance of bias that required Judge Bruce to recuse himself under § 455(a). *See* Counseled 2255 Mot. 15. The Government does not explicitly address whether Judge Bruce's impartiality might reasonably have been questioned and, thus, whether he should have recused himself from Pettis's case under

§ 455(a).⁶ Instead, it argues that this statutory claim is both untimely and not cognizable. Resp. 6–14.⁷

### i. Timeliness

Pursuant to the Antiterrorism and Effective Death Penalty Act, a federal prisoner seeking to vacate his sentence under § 2255 has one year to do so, from the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Pettis acknowledges that his Pro Se 2255 Motion was filed outside the one-year statute of limitations provided by 28 U.S.C. § 2255(f)(1) but argues that he is entitled to equitable tolling of the statute of limitations because Federal Public Defender Thomas Patton made a legal error and failed to preserve Pettis's right to raise a claim based on Judge Bruce's failure to recuse from his case. Counseled 2255 Mot. 3.⁸ The Government argues that equitable tolling does not apply

---

⁶ To the Court's knowledge, the Government has conceded an appearance of impropriety—and thus a violation of § 455(a)—in every case involving Judge Bruce's communications that has been decided by the Seventh Circuit so far. *See, e.g., Atwood*, 941 F.3d at 885; *Williams*, 949 F.3d at 1063; *United States v. Orr*, 969 F.3d 732, 738 (7th Cir. 2020).

⁷ It also argues that any violation of § 455(a) would not entitle Pettis to a new sentencing or trial, Resp. 19–23, but the Court need not reach this question.

⁸ The Court cannot ascertain whether Pettis contends his motion is timely under § 2255(f)(2), (3), or (4). He states that there are "a few exceptions to the on[e]-year period of limitations in cases where there was an impediment from making a motion," citing to § 2255(f)(2), (3), and (4). Counseled 2255 Mot. 3. But he makes no argument that any of these provisions apply. Instead, he goes on to argue for equitable tolling, *id.*, which is a common law doctrine distinct from the statutory provisions, *cf. Estremera v. United States*, 724 F.3d 773, 777 (7th Cir. 2013)

here because an attorney's errors are attributed to his client, because any alleged failures by counsel in this case are not extraordinary, and because Pettis did not diligently pursue his rights. *See* Resp. 8–10.

The time limits set forth in § 2255(f) are subject to equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 649 (2010) (holding that the statute of limitations for § 2254 motions are subject to equitable tolling); *Lombardo v. United States*, 860 F.3d 547, 551–52 (7th Cir. 2017) (applying the equitable tolling doctrine to a motion under § 2255). A petitioner is entitled to equitable tolling if he can show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (quotation marks omitted). "[T]he threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule." *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000). "A petitioner bears the burden of establishing both elements of the *Holland* test; failure to show either element will disqualify him from eligibility for tolling." *Mayberry v. Dittmann*, 904 F.3d 525, 529–30 (7th Cir. 2018).

Here, Pettis barely develops his argument that he has met both elements of the *Holland* test. He cites *Holland* for the proposition that "[a]n attorney's unprofessional conduct can be so egregious as to create an extraordinary circumstance warranting equitable tolling" but then merely states that Patton told him he made a legal error and failed to preserve his right to bring a claim based on Judge Bruce's failure to recuse. *See* Counseled 2255 Mot. 3 (quotation marks

---

(distinguishing between common law equitable tolling and § 2255(f)(2)). In any case, the Court finds that Pettis's motion is not timely under § 2255(f)(2), (3), or (4). Because Pettis does not allege that any government action created an impediment to filing a § 2255 motion, § 2255(f)(2) does not apply. And because Pettis does not rely on a new right recognized by the Supreme Court, § 2255(f)(3) does not apply. The Government argues that even if § 2255(f)(4) applies, the Pro Se 2255 Motion was filed outside the statute of limitations because it was filed more than a year after Pettis learned of Judge Bruce's improper communications. Resp. 7–8. The Court agrees. The record demonstrates that Pettis was aware of the *ex parte* communications in September 2018 when he sent a letter to Judge James Shadid, who was then the chief judge of this District, about the communications. Letter to Shadid, ECF No. 75. Pettis did not file his Pro Se 2255 Motion until 2020, which was more than one year later.

omitted). Pettis does not acknowledge that in *Holland*, the Supreme Court held that "a garden variety claim of excusable neglect . . . does not warrant equitable tolling," *Holland*, 560 U.S. at 651–52 (quotation marks and citations omitted), or that the facts of *Holland* are quite distinguishable from the facts of his case. In *Holland*, the Supreme Court found that the attorney's conduct "may well" have warranted equitable tolling because the facts showed that it went beyond simple negligence: the attorney did not file the petitioner's § 2254 petition on time despite the petitioner sending "many letters that repeatedly emphasized the importance of his doing so"; he did not research the applicable filing date; he did not inform the petitioner that the Florida Supreme Court had decided his case despite the petitioner's "many pleas for that information"; and the attorney "failed to communicate with his client over a period of years, despite various pleas from [the petitioner] that [the attorney] respond to his letters." *Id.* at 652. The Court remanded for further consideration because "no lower court ha[d] yet considered in detail the facts of th[e] case to determine whether they indeed constitute extraordinary circumstances sufficient to warrant equitable relief." *Id.* at 653–54. Pettis points to no facts—and cites no further cases—to support his argument that Patton's legal mistake would go beyond mere negligence and support a finding of extraordinary circumstances warranting equitable tolling. *See Ademiju v. United States*, 999 F.3d 474, 477 (7th Cir. 2021) ("[I]ncorrect legal advice generally does not by itself trigger equitable tolling."). Moreover, Pettis merely states in a conclusory fashion that he "diligently filed his *pro se* filing upon learning of the mistake." Counseled 2255 Mot. 3. But "mere conclusory allegations of diligence are insufficient." *Mayberry*, 904 F.3d at 531.

The Court concludes that Pettis has failed to establish his entitlement to equitable tolling, so it finds his § 455(a) claim untimely.

### ii. Cognizability

Even if the Court found that the § 455(a) claim was timely, however, it would not warrant relief.  Section 2255 "was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis v. United States*, 417 U.S. 333, 343 (1974).  Although the language of § 2255 suggests that a prisoner can obtain relief if his sentence was imposed in violation of the "laws of the United States," § 2225(a), not "every asserted error of [nonconstitutional] law can be raised on a § 2255 motion." *Davis*, 417 U.S. at 346.  The "appropriate inquiry [i]s whether the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice, and whether it presents exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Id.* (quotation marks and alterations omitted); *see also Reed v. Farley*, 512 U.S. 339, 348 (1994) (noting the standard as whether the federal law violation qualifies as "a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure" (alteration in original) (quotation marks omitted)).[9]

Two circuit courts have addressed whether a § 455(a) claim is cognizable on a § 2255 motion.[10]  In *United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990), the Fifth Circuit found the relevant inquiry to be "whether there was an appearance of impropriety which rose to the level of a fundamental defect resulting in a complete miscarriage of justice." *Id.* (quotation marks omitted).  It held that "[a]bsent that level of severity, the claim of an appearance of impropriety

---

[9] Although *Reed* involved a motion under 28 U.S.C. § 2254, *Reed*, 512 U.S. at 347, the Supreme Court held that the same standard that applies to determining whether a nonconstitutional federal law violation is cognizable on § 2255 review applies to § 2254 cases, *id.* at 353–54.

[10] In an unpublished opinion, the Tenth Circuit addressed a § 455 bias claim on § 2255 review because the petitioner "assert[ed] that he was unaware of the facts allegedly warranting recusal when direct review was available." *United States v. Austin*, 48 F.3d 1233, at *1 & n.2 (10th Cir. 1995) (table opinion) (citing *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989)).  But as this case is unpublished and does not analyze this issue specifically, it is not persuasive, and the Court will not address it here.

14

is not cognizable under 28 U.S.C. § 2255." *Id.* It noted that "section 455 and the Due Process Clause are not coterminous" and that "conduct violative of section 455 may not constitute a due process deficiency." *Id.* And it appeared to hold that a § 455(a) claim is only cognizable where the § 455(a) violation falls "within [a] protected constitutional dimension" where § 455 and the Due Process Clause overlap. *Id.* at 82, 83.[11]

In *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989), the Second Circuit assumed without deciding "that as a general matter collateral attack upon a criminal sentence may be available under section 2255 to pursue a claim of appearance of impartiality." It made this assumption based on the Supreme Court's decision in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). *Liljeberg* involved a motion under Federal Rule of Civil Procedure 60(b)(6) to vacate a civil judgment on the basis that the judge should have recused himself under § 455(a). *Liljeberg*, 486 U.S. at 858, 863. Rule 60(b)(6) allows district courts to grant relief from a final civil judgment in "extraordinary circumstances." *Id.* at 863–64 (quotation marks omitted). The Supreme Court held that

> in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*Id.* at 864. The Second Circuit in *Hardy* noted initially that it "doubt[ed] that an *appearance* of impropriety under section 455(a), without more, [would] constitute[] the type of 'fundamental

---

[11] The Fifth Circuit's precise holding as it relates to the facts of the case is not clear. The district judge considering the defendant's § 2255 motion had resentenced the defendant "to comply with the spirit and beyond of *Liljeberg* [v. *Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)]." *Couch*, 896 F.2d at 80 (quotation marks omitted). The Fifth Circuit found that the alleged § 455(a) violation did not fall within protected constitutional dimensions warranting § 2255 relief. *Id.* at 82, 83 ("We conclude and hold that Couch's claims of an appearance of impropriety do not rise to the level of a fundamental defect in due process cognizable under 28 U.S.C. § 2255."). It noted that by resentencing the defendant, the district judge had accorded him "a measure of process well beyond that due on the facts of his case," but that it was "within [the judge's] power to do so." *Id.* at 82. The Fifth Circuit does not make explicit what gave the judge the power to resentence the defendant but seemed to hold that it was not required or warranted under § 2255.

defect' that would justify vacating an otherwise lawful sentence under section 2255." *Hardy*, 878 F.2d at 97. It reasoned that, after *Liljeberg*, it was "not certain" whether the Court would similarly hold that a criminal judgment may be collaterally attacked based on an appearance of impropriety but concluded that "the analogy [wa]s sufficiently close to warrant" the assumption that it would "for purposes of [that] appeal." *Id.* The only dispositive holding from the Second Circuit in *Hardy*, however, was that the defendant could not obtain relief under section 2255 because she was aware of the basis for the judge's recusal when direct appeal was available. *Id.* at 98.

Like in *Couch*, the Court finds that a § 455(a) claim could be cognizable on § 2255 review, but only if it meets the standard laid out in *Davis*. Under that standard, the alleged § 455(a) error must be "a fundamental defect which inherently results in a complete miscarriage of justice" and "present[] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Davis*, 417 U.S. at 346 (quotation marks omitted). Here, the alleged error does not rise to that level. As noted above, Pettis has not established a due process violation and has no evidence that any of Judge Bruce's communications or relationships with the USAO impacted his proceedings or prejudiced him. *Cf. Bachner v. United States*, 517 F.2d 589, 597 (7th Cir. 1975) ("The remote and theoretical possibility that a complete miscarriage of justice might have occurred is not enough to satisfy the Davis test, when in fact no injustice has been done."); *Reed*, 512 U.S. at 350–52 (finding a state court's failure to comply with the Interstate Agreement on Detainers was not cognizable on § 2254 review where the defendant did not object and no prejudice resulted because the case "lack[ed] aggravating circumstances rendering the need for the remedy afforded by the writ of *habeas corpus* . . . apparent" (second alteration in original) (quotation marks omitted))). Though Pettis argues that

16

Judge Bruce made discretionary decisions that impacted his case—the ruling on the motion to suppress, denying his objections at trial, and sentencing him to the maximum possible term of imprisonment, *see* Counseled 2255 Mot. 3–6, 20, 23—he makes no argument that the appearance of bias impacted these decisions.[12]  Finally, any violation of § 455(a) would have no bearing on Pettis's guilt or innocence.  *See Hussong v. Warden*, 623 F.2d 1185, 1185, 1191 (7th Cir. 1980)

---

[12] Regardless, the Court does not find that these were close discretionary calls. *Cf. Orr*, 969 F.3d at 739–41 (considering whether Judge Bruce made close discretionary calls in determining whether his failure to recuse was harmless error).  First, the suppression ruling was affirmed on appeal.  *See Pettis*, 720 F. App'x at 307.  Second, Pettis was sentenced below what his Sentencing Guidelines range would have been absent the statutory maximum, and he did not even ask for a lower term of imprisonment.  And third, though Pettis identifies three objections he made that were overruled at trial, Counseled 2255 Mot. 5–6, none were particularly close calls or particularly prejudicial to him.  For example, Judge Bruce allowed the Government to show pictures of Pettis wearing the coat the gun was found in over Pettis's objection.  *See* Trial Tr. Vol. II 220:24–224:1.  Pettis first objected for lack of foundation because the Government did not know who took the pictures or when, *id.* at 220:24–221:5, but because the Government was only offering the pictures so the detective could identify that they depicted Pettis in the coat, no more foundation was necessary, *id.* at 223:4–224:1.  Pettis then objected to the photos under Federal Rule of Evidence 403, *id.* at 224:19–24, but there was nothing *unfairly* prejudicial about the pictures even though they connected him to the coat the gun was found in, *see id.* at 225:1–9 ("They're just a photograph of him standing there wearing a coat."); *cf. United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004) ("[M]ost relevant evidence, by its very nature, is prejudicial[.]  [O]nly unfairly prejudicial evidence must be excluded.").  Judge Bruce also allowed the Government to ask Daytreon Pettis about the street value of firearms on the street over Pettis's objection that it was irrelevant.  *See* Trial Tr. Vol. III 67:9–15.  But after Daytreon gave an incomplete answer, the Government ceased its questioning.  *Id.* at 67:16–18.  Pettis fails to explain how this caused him any prejudice.  Lastly, Judge Bruce allowed investigator Steve Guess to testify that he worked for Champaign County over Pettis's objection that where he worked was irrelevant.  *See id.* at 77:5–8.  Pettis claims "[t]his was improper witness bolstering," Counseled 2255 Mot. 6, but fails to explain any further.  It is not clear how this was bolstering—Guess's testimony makes clear that he was working for Pettis's attorney, not the prosecution.  *See* Trial Tr. Vol. III 77:24–78:16.  In any case, testimony about where Guess worked did not "significantly aid[] the prosecution" or prejudice Pettis.  *Orr*, 969 F.3d at 740–41.  Moreover, Pettis fails to mention that Judge Bruce also sustained many of his objections at trial, *see, e.g.*, Trial Tr. Vol. II 40:20–24 (sustaining objection to testimony about size range options for stolen body armor); *id.* at 83:20–84:4 (sustaining objection to police officer testifying regarding why he tested a particular area for gunshot residue); Trial Tr. Vol. III 22:3–16 (sustaining objection to allowing prosecution to cross-examine Lee about whether she was buying drugs from Pettis), and overruled many of the Government's objections, *id.* at 37:1–10 (overruling objection to foundation); *id.* at 165:20–166:5 (overruling objection that counsel was going outside the record during closing); *id.* at 168:4–12 (overruling objection that counsel was vouching for the facts); *cf. Williams*, 949 F.3d at 1064 (noting that "Judge Bruce equally granted and denied objections from both parties" at trial and that "[n]one of th[o]se rulings suggest[ed] that Judge Bruce's appearance of bias had any impact on the outcome of Williams's trial").  Additionally, Pettis fails to mention that Judge Bruce granted one of his motions in *limine* and precluded the Government from introducing evidence that when Pettis was arrested, he said he "'needed to get out from under this case,' and offered to provide information to the police regarding other crimes that had recently been committed in the Champaign area."  Def.'s Pre-Trial Mots. Limine 2, ECF No. 26.  The Government argued the statement showed consciousness of guilt, but Judge Bruce explained that he viewed it as "a close call . . . . within the realm of a tie." Final Pretrial Hr'g Tr. 10:19–20, ECF No. 64.  He explained that it could be interpreted as consciousness of guilt but could also be interpreted in "a different way to say it is someone who's, like, 'Look, I just want to get rid of this charge.  This is stupid.  I didn't do anything.'"  *Id.* at 10:13–18.  Because it was a close call and it would confuse the jury, Judge Bruce granted Pettis's motion.  *Id.* at 10:19–22.  Even after reconsidering the issue at trial, Judge Bruce precluded the evidence.  *See* Trial Tr. Vol. III 98:24–100:2.

(finding that a § 2254 "petitioner's incarceration in violation of section 2515 of the federal wiretap statute d[id] not meet the required 'complete miscarriage of justice' standard required of nonconstitutional violations of federal law in order to be cognizable under the federal habeas corpus statute," noting in part that "the issues he ask[ed] [the court] to redetermine h[ad] no bearing on the basic justice of his incarceration" and that nothing in the record indicated he was not guilty (quotation marks omitted)).

The Court does not find that *Liljeberg* requires a different result. *Liljeberg* identified three factors for determining whether a civil judgment should be vacated under Rule 60(b)(6) due to extraordinary circumstances. *See Liljeberg*, 486 U.S. at 858. And in *United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019), the Seventh Circuit used those factors to determine whether a statutory recusal error was harmless on appeal. The *Davis* standard for nonconstitutional errors requires more than a showing of extraordinary circumstances or that a statutory error was not harmless. It is a "well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Even if the Court found that the error was not harmless under those factors, that would not suffice to meet the *Davis* standard. See Brian R. Means, Federal Habeas Manual § 1:38 (May 2022 Update) (noting that the *Davis* "standard is more onerous . . . than the harmless error test applied to non-constitutional claims raised on direct appeal"); *United States v. Addonizio*, 442 U.S. 178, 184 (1979) ("It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."). "There is a difference between reversing an error on appeal and correcting the error years later." *Hawkins v. United States*, 706 F.3d 820, 824 (7th Cir. 2013).

Pettis has not shown that any violation of § 455(a) was a fundamental defect resulting in a complete miscarriage of justice. His § 455(a) claim, therefore, does not warrant relief under § 2255, and it is denied.

### C. Ineffective Assistance of Counsel

Pettis asserts that the FPD "provided him ineffective assistance of counsel" in violation of the Sixth Amendment in two ways. *See* Counseled 2255 Mot. 26–27. First, he argues that the FPD "was ineffective for failing to include claims [based on Judge Bruce's communications with the USAO] in direct appeals once the full scope of the . . . communications was revealed." *Id.* at 27. And second, he argues that the FPD was ineffective for failing to include him in a tolling agreement for actual bias claims and for failing to secure an agreement for appearance of bias claims. *Id.*

The Government makes a number of arguments against these claims. *See* Resp. 23–28. The Court finds it unnecessary to address them because it finds these claims are easily denied. With respect to the first claim, Pettis's direct appeal was decided in December 2017, months before the *ex parte* communications came to light. Counsel could not have been ineffective for failing to raise an argument based on communications of which she was not aware. And with respect to the second claim, Pettis had no right to counsel beyond his direct appeal. *Coleman v. Thompson*, 501 U.S. 722, 756 (1991) ("[A] criminal defendant has no right to counsel beyond his first appeal . . . ."); *cf. Garza v. Idaho*, 139 S. Ct. 738, 749 (2019) ("There is no right to counsel in postconviction proceedings . . . ." (citation omitted)). Any deficient performance in obtaining tolling agreements for postconviction review could not constitute a Sixth Amendment violation.

### III.    Certificate of Appealability

When a district court enters a final order adverse to an applicant, it must issue or deny a certificate of appealability. Rule 11(a), Rules Governing § 2255 Proceedings. A court can grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Pettis has failed to make a substantial showing of the denial of a constitutional right, so the Court declines to issue a certificate of appealability.

## CONCLUSION

Accordingly, Defendant-Petitioner Kevin Pettis's *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, ECF No. 76, *pro se* motion for status, ECF No. 97, and counseled motion for a status conference, ECF No. 98, are MOOT. His counseled Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, ECF No. 79, is DENIED. The Clerk is directed to enter judgment on the § 2255 motion and close the accompanying civil case, No. 2:20-cv-02060-SLD.

Entered this 27th day of March, 2023.

                                         s/ Sara Darrow
                                         SARA DARROW
                                         CHIEF UNITED STATES DISTRICT JUDGE